**UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | |
|---|---|
| COUNTY OF DORCHESTER, SOUTH CAROLINA, *and* TOWN OF SUMMERVILLE, SOUTH CAROLINA, Plaintiffs, v. AT&T CORP. and BELLSOUTH TELECOMMUNICATIONS, LLC, Defendants. | Case No. 2:18-cv-2890-RMG |

**DEFENDANTS' MOTION TO STRIKE THE CLASS ALLEGATIONS**
**AND PARTIAL MOTION TO DISMISS AND MEMORANDUM IN SUPPORT**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................................................ ii

INTRODUCTION ...................................................................................................................... 1

BACKGROUND ....................................................................................................................... 2

    A.    South Carolina Local Governments ............................................................ 2

    B.    South Carolina's 911 Act ........................................................................... 3

    C.    Local 911 Ordinances ................................................................................. 7

    D.    The Class Action Complaint ....................................................................... 8

STANDARD OF REVIEW ......................................................................................................... 9

ARGUMENT .......................................................................................................................... 10

I.    THE COURT SHOULD STRIKE PLAINTIFFS' CLASS ALLEGATIONS ................. 10

    A.    State and Local Laws Vest Counties and Their Duly Appointed
          Officials with Exclusive Authority To Initiate a Suit on Their Behalf ................ 11

    B.    Plaintiffs' Proposed Class Is Not Sufficiently Numerous To Merit Class
          Treatment Under Rule 23(a)(1) ................................................................. 19

II.    THE COMPLAINT FAILS, IN PART, TO STATE A CLAIM FOR WHICH
      RELIEF CAN BE GRANTED ....................................................................... 21

    A.    The Complaint's Claims About How the 911 Act Requires AT&T To
          Bill Their Multiplex Customers Fail as a Matter of Law ..................................... 21

    B.    The Complaint's Claim That the 911 Act Requires Defendants To
          Charge Their VoIP Customers More Than 50 911 Charges Per Account
          Fails as a Matter of Law ............................................................................ 25

CONCLUSION ........................................................................................................................ 31

# TABLE OF AUTHORITIES

Page

**CASES**

*Ackal v. Centennial Beauregard Cellular, LLC*, 700 F.3d 212 (5th Cir. 2012) .......................... 18

*Adams v. Air Methods Corp.*, 2016 WL 7115905 (D.S.C. Aug. 12, 2016) .................................... 9

*Alltel Commc'ns, Inc. v. S.C. Dep't of Revenue*, 731 S.E.2d 869 (S.C. 2012) ...................... 30, 31

*Bay Area Cellular Tel. Co. v. City of Union City*, 75 Cal. Rptr. 3d 839
    (Ct. App. 2008) ....................................................................................................... 12

*BellSouth Telecomms., Inc. v. City of Orangeburg*, 522 S.E.2d 804 (S.C. 1999) ....................... 12

*BellSouth Telecomms., LLC v. Cobb County*, 802 S.E.2d 686 (Ga. Ct. App. 2017),
    *cert. granted*, No. S17G2011 (Ga. Apr. 16, 2018) ............................................................ 4

*Berry v. McLeod*, 492 S.E.2d 794 (S.C. Ct. App. 1997).......................................................... 11, 12

*CFRE, LLC v. Greenville Cty. Assessor*, 716 S.E.2d 877 (S.C. 2011) ......................................... 25

*City & County of Denver v. Am. Oil Co.*, 53 F.R.D. 620 (D. Colo. 1971) ................................... 20

*City Council of Abbeville v. Leopard*, 39 S.E. 248 (S.C. 1901) ..................................................... 3

*Cooper River Bridge, Inc. v. S.C. Tax Comm'n*, 188 S.E. 508 (S.C. 1936) ................................. 30

*Dallas County v. MERSCORP, Inc.*, 2012 WL 6208385 (N.D. Tex. Dec. 13, 2012) ................. 17

*Davis v. County of Greenville*, 470 S.E.2d 94 (S.C. 1996)..................................................... 27, 28

*Dennis v. Norwich Pharmacal Co.*, 1973 WL 141 (D.S.C. Feb. 26, 1973).................................. 19

*Dickenson-Russell Coal Co. v. Sec'y of Labor*, 747 F.3d 251 (4th Cir. 2014)............................ 26

*Drayton v. County of Charleston*, 2015 WL 4937358 (D.S.C. Aug. 17, 2015) .......................... 10

*Duncan v. County of York*, 228 S.E.2d 92 (S.C. 1976)................................................................. 2

*E. Shore Markets, Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175 (4th Cir. 2000) ...................... 10

*Ex parte Greenville County*, 2 S.E.2d 47 (S.C. 1939) ........................................................... 15, 16

*Ex parte Hart*, 2 S.E.2d 52 (S.C. 1939) ................................................................................ 11, 12

*Ex parte Lynch*, 1881 WL 5943 (S.C. 1881) ............................................................................... 13

*Ferguson Fire & Fabrication, Inc. v. Preferred Fire Prot., LLC*, 762 S.E.2d 561
    (S.C. 2014) ..................................................................................................... 23

*Fleming v. Travenol Labs., Inc.*, 707 F.2d 829 (5th Cir. 1983) .................................... 19

*George v. Duke Energy Ret. Cash Balance Plan*, 259 F.R.D. 225 (D.S.C. 2009) ...................... 20

*Gray v. Hearst Commc'ns, Inc.*, 2010 WL 11531121 (D.S.C. Feb. 1, 2010),
    *aff'd*, 444 F. App'x 698 (4th Cir. 2011) ........................................................... 19

*Hamilton Cty. Emergency Commc'ns Dist. v. BellSouth Telecomms., LLC*, 154 F.
    Supp. 3d 666 (E.D. Tenn. 2016), *reversed and remanded*, 852 F.3d 521
    (6th Cir. 2017) ..................................................................................................... 4

*Henderson v. Evans*, 232 S.E.2d 331 (S.C. 1977) ..................................................... 28

*Hosp. Ass'n of S.C., Inc. v. County of Charleston*, 464 S.E.2d 113 (S.C. 1995) ........................... 3

*Hum v. Dericks*, 162 F.R.D. 628 (D. Haw. 1995) ........................................................ 20

*In re Automotive Parts Antitrust Litig.*, No. 2:14-cv-00106 (E.D. Mich. Apr. 30,
    2015) (Dkt. No. 61) ........................................................................................... 18

*Jaynes v. United States*, 69 Fed. Cl. 450 (2006) ....................................................... 20

*Kelley v. Norfolk & W. Ry. Co.*, 584 F.2d 34 (4th Cir. 1978) ................................... 19-20

*Kessler v. Hevesi*, 846 N.Y.S.2d 56 (App. Div. 2007) ................................................ 12

*Knight v. Salisbury*, 206 S.E.2d 875 (S.C. 1974) ...................................................... 11

*Lienhart v. Dryvit Sys., Inc.*, 255 F.3d 138 (4th Cir. 2001) ......................................... 19

*Madison Cty. Commc'ns Dist. v. BellSouth Telecomms., Inc.*, 2009 WL 9087783
    (N.D. Ala. Mar. 31, 2009) .................................................................................... 4

*Merced County v. Cook*, 52 P. 721 (Cal. 1898) ......................................................... 15

*Minersville Coal Co. v. Anthracite Exp. Ass'n*, 55 F.R.D. 426 (M.D. Pa. 1971) ...................... 20

*Mungo v. CUNA Mut. Ins. Soc'y*, 2012 WL 3704924 (D.S.C. Aug. 24, 2012) ............................. 9

*Nat'l Cable & Telecomms. Ass'n, Inc. v. Gulf Power Co.*, 534 U.S. 327 (2002) ....................... 29

*Newman v. Richland Cty. Historic Pres. Comm'n*, 480 S.E.2d 72 (S.C. 1997) ......................... 11

*Newport News Shipbuilding & Dry Dock Co. v. Brown*, 376 F.3d 245
    (4th Cir. 2004) ..................................................................................................... 28

*Olds v. City of Goose Creek*, 818 S.E.2d 5 (S.C. 2018) ........................................ 16, 27

*Owens v. Magill*, 419 S.E.2d 786 (S.C. 1992) ................................................. 3

*Parker v. Asbestos Processing, LLC*, 2015 WL 127930 (D.S.C. Jan. 8, 2015)........................... 17

*Phone Recovery Servs., LLC v. Qwest Corp.*, 919 N.W.2d 315 (Minn. 2018)........................... 12

*Phone Recovery Servs., LLC v. Verizon of New Eng., Inc.*, 2015 WL 8331983
    (Mass. Super. Ct., Suffolk Cty., Oct. 27, 2015), *aff'd*, 102 N.E.3d 968
    (Mass. 2018) ......................................................................... 12

*Priester v. Cromer*, 736 S.E.2d 249 (S.C. 2012) .............................................. 30

*Roman v. ESB, Inc.*, 550 F.2d 1343 (4th Cir. 1976) ........................................... 19

*S.C. Dep't of Soc. Servs. v. Lisa C.*, 669 S.E.2d 647 (S.C. Ct. App. 2008)................................. 28

*S.C. Nat'l Bank v. S.C. Tax Comm'n*, 376 S.E.2d 512 (S.C. 1989)................................. 30

*Scott v. Family Dollar Stores, Inc.*, 733 F.3d 105 (4th Cir. 2013)................................. 9

*Southwest Gas Corp. v. Third Judicial Dist. Court*, 449 P.2d 259 (Nev. 1969)........................ 18

*State v. 192 Coin-Operated Video Game Machs.*, 525 S.E.2d 872 (S.C. 2000)........................ 28

*Town of Claverack v. Brew*, 277 A.D.2d 807 (N.Y. 2000)...................................... 16, 18

*TracFone Wireless, Inc. v. Comm'n on State Emergency Commc'ns*,
    397 S.W.3d 173 (Tex. 2013)............................................................ 12

*Travelscape, LLC v. S.C. Dep't of Revenue*, 705 S.E.2d 28 (S.C. 2011) ................................. 5-6

*Utah v. Am. Pipe & Constr. Co.*, 49 F.R.D. 17 (C.D. Cal. 1969)................................. 20

*Verizon v. FCC*, 740 F.3d 623 (D.C. Cir. 2014)................................................ 26

*Wigfall v. Tideland Utils., Inc.*, 580 S.E.2d 100 (S.C. 2003)..................................... 15

*Williams v. Preiss-Wal Pat III, LLC*, 17 F. Supp. 3d 528 (D.S.C. 2014) ................................. 28

**ADMINISTRATIVE DECISIONS**

First Report and Order and Notice of Proposed Rulemaking, *IP-Enabled Services*,
    20 FCC Rcd 10245 (2005).............................................................. 6, 29

Notice of Proposed Rulemaking, *911 Call-Forwarding Requirements for
    Non-Service-Initialized Phones*, 30 FCC Rcd 3449 (2015)................................. 12

# CONSTITUTION, STATUTES, REGULATIONS, AND RULES

S.C. Const. art. VIII ................................................................................................ 2

NET 911 Improvement Act of 2008, Pub. L. No. 110-283, § 101, 122 Stat. 2620,
    2620-23 .................................................................................................................. 6

    47 U.S.C. § 615a-1 ............................................................................................ 6

    47 U.S.C. § 615a-1(f)(1).......................................................................... 29, 30

    47 U.S.C. § 615b(8) .......................................................................................... 6

Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56........................ 29

47 U.S.C. § 1302(a) ................................................................................................ 29

S.C. Code Ann. § 4-1-10............................................................................................. 3

S.C. Code Ann. § 4-1-10(1) ...................................................................................... 3

S.C. Code Ann. § 4-9-25 ............................................................................................ 3

S.C. Code Ann. § 4-9-30 ............................................................................................ 3

S.C. Code Ann. § 5-7-30............................................................................................. 3

S.C. Code Ann. § 23-47-10 *et seq.* ("911 Act") ...................................................... *passim*

    § 23-47-10(17) .............................................................................................. 26

    § 23-47-40(A) ........................................................................................... 3, 26

    § 23-47-40(B)(4)............................................................................................. 5

    § 23-47-50 ....................................................................................................... 4

    § 23-47-50(A) (2009)...................................................................................... 6

    § 23-47-50(A) ........................................................... 4, 6, 7, 22, 23, 25, 26, 27

    § 23-47-50(A)(a)................................................................................. 2, 24, 25

    § 23-47-50(A)(b)..................................................................................... 2, 22

    § 23-47-60(A) .................................................................................................. 5

    § 23-47-67(A) ....................................................................................... 6, 26, 27

    § 23-47-67(B)................................................................................................. 26

    § 23-47-67(E)................................................................................................... 5

2010 S.C. Act No. 135 (Apr. 1, 2010) ................................................................... 4

   § 3 ....................................................................................................................... 4, 6

   § 6 .......................................................................................................................... 6

Aiken County (S.C.) Code ...................................................................................... 13

   § 2-181 ................................................................................................................. 13

   § 2-183 ................................................................................................................. 14

   § 2-187 ................................................................................................................. 14

Anderson County (S.C.) Code:

   § 2-177(a) ............................................................................................................ 14

   § 2-178(b)(1) ........................................................................................................ 14

Cayce City (S.C.) Code:

   § 2-201 ................................................................................................................. 15

   § 2-203 ................................................................................................................. 15

Colleton County (S.C.) Code § 2.30.020(D) ......................................................... 14

Darlington County (S.C.) Code § 2-56 .................................................................. 14

Dorchester County (S.C.) Code § 2-97(f) .............................................................. 16

Goose Creek City (S.C.) Code:

   § 32.45 ................................................................................................................. 15

   § 32.51 ................................................................................................................. 15

Greenville County (S.C.) Code § 2-151 ................................................................. 14

Jasper County (S.C.) Code § 2-69 .......................................................................... 14

Orangeburg County (S.C.) Code:

   § 2-221 ................................................................................................................. 14

   § 2-225 ................................................................................................................. 14

Summerville Town (S.C.) Code § 2-262 ................................................................ 16

Fed. R. Civ. P.:

    Rule 12(b)(6) ........................................................................................... 1, 28

    Rule 23 ..................................................................................................... 1, 17

    Rule 23(a) ......................................................................................... 1, 8, 10, 19

    Rule 23(a)(1) ................................................................................................. 19

    Rule 23(b)(2) ............................................................................................. 8, 15

    Rule 23(b)(3) ............................................................................................. 8, 15

**LEGISLATIVE MATERIALS**

H.B. 4551, 2009-2010 Gen. Assemb., 118th Sess. (S.C. Feb. 16, 2010),
    https://bit.ly/2D2GLSm:

    § 3 ............................................................................................................. 5

    § 5 ............................................................................................................. 7

H.B. 4551, 2009-2010 Gen. Assemb., 118th Sess. (S.C. Mar. 4, 2010),
    https://bit.ly/2Ar1lt6:

    § 3 ............................................................................................................. 6

    § 5 ............................................................................................................. 7

H.B. 4551 § 3, 2009-2010 Gen. Assemb., 118th Sess. (S.C. Mar. 11, 2010),
    https://bit.ly/2Aq5kGi ................................................................................. 6

S.B. 1147, 2009-2010 Gen. Assemb., 118th Sess. (S.C. Feb. 9, 2010),
    https://bit.ly/2OVcdIy:

    § 3 ............................................................................................................. 5

    § 5 ............................................................................................................. 7

S.B. 1147 § 3, 2009-2010 Gen. Assemb., 118th Sess. (S.C. Mar. 3, 2010),
    https://bit.ly/2SzloMS ................................................................................. 5

S.B. 1147, 2009-2010 Gen. Assemb., 118th Sess. (S.C. Mar. 4, 2010),
    https://bit.ly/2Pyc5hQ:

    § 3 .......................................................................................................... 5, 6

    § 6 ............................................................................................................. 7

## ADMINISTRATIVE MATERIALS

U.S. Gen. Accounting Office, *National Weather Service — Alabama 911 Service Charge and Utility Service Use Tax*, B-300737 (Comp. Gen. June 27, 2003), https://bit.ly/2Dabb5f ................................................................................ 12

## OTHER MATERIALS

Aff. of Kara Gerwin, attached as Ex. A to Pl.'s Resp. to Defs.' Jt. Mot. for J. on the Pleadings, *County of Richland v. AT&T Corp., et al.*, No. 3:18-cv-01295 (D.S.C. Dec. 7, 2018) (Dkt. No. 74-1) ........................................................... 27-28

Compl., *Bedford Cty. Emergency Commc'ns Dist., et al. v. Level 3 Commc'ns, LLC*, No. 1:14-cv-376 (E.D. Tenn. Dec. 31, 2014) (Dkt. No. 1) ..................................... 21

Defs.' Jt. Mot. for J. on the Pleadings on Two Counterclaims and Mem. in Support, *County of Charleston v. AT&T Corp., et al.*, No. 2:17-cv-02534-RMG (D.S.C. Nov. 9, 2018) (Dkt. No. 134) ......................................................... 2

Defs.' Jt. Mot. for J. on the Pleadings on Two Counterclaims and Mem. in Support, *County of Richland v. AT&T Corp., et al.*, No. 3:18-cv-01295-RMG (D.S.C. Nov. 9, 2018) (Dkt. No. 69) ........................................................... 1-2

Dorchester County (S.C.), County Council Meeting Minutes (Sept. 4, 2018), https://bit.ly/2AtyVhT ........................................................................................... 16

Plaintiff's Response to the Court's July 13, 2018 Order, *County of Charleston v. AT&T Corp., et al.*, No. 2:17-cv-02534-RMG (D.S.C. July 16, 2018) (Dkt. No. 88) ...................................................................................................... 21

1 William B. Rubenstein, *Newberg on Class Actions* (5th ed. 2011) .......................................... 20

Town of Summerville (S.C.), Town Council Meeting Minutes (Oct. 18, 2018), https://bit.ly/2F6EHsP ........................................................................................... 16

Tolling Agreement, *Cobb County, et al. v. Comcast Bus. Commc'ns, LLC, et al.*, Nos. 1:16-CV-00495-AT & 1:17-CV-00035-AT (N.D. Ga. Oct. 13, 2017) (Dkt. No. 26-1) .................................................................................................... 21

*Webster's Third New International Dictionary* (2002) ............................................... 29

AT&T Corp. and BellSouth Telecommunications, LLC ("AT&T" or "Defendants") move, pursuant to Rules 12(b)(6) and 23, to strike the class allegations in the Complaint ("Complaint") filed by the County of Dorchester and the Town of Summerville ("Plaintiffs") on behalf of themselves and all similarly situated local governments in South Carolina (the "Class"). *See* Dkt. No. 1. Defendants also seek dismissal, in part, of all counts in the Complaint.

## INTRODUCTION

Private, non-governmental lawyers representing one town and one county have filed a putative class action on behalf of nearly every other sovereign authority in South Carolina that operates its own 911 emergency call answering service. But the Complaint offers no indication that either Plaintiffs or their lawyers consulted with government officials for those other sovereign entities with the authority to initiate litigation, much less received authorization to bring legal claims in their name. This attempt to usurp the most basic government functions — the decision whether to sue and the interpretation and enforcement of tax laws — is unprecedented, and for good reason. It infringes on sovereign authority in violation of state law and the local ordinances of the absent government entities that identify the specific elected or appointed lawyers with authority to litigate on their behalf. Moreover, the putative class here is too small to satisfy Rule 23(a)'s numerosity requirement. All the absent members are located in one state and fully capable of pursuing claims in their own right. Indeed, more than 50 local government entities in other states have brought analogous claims in their own names. The class allegations should be stricken.

On the merits, the Complaint alleges violations of South Carolina's 911 Act that are at odds with the statute's plain language. S.C. Code Ann. § 23-47-10 *et seq.* ("911 Act").[1] *First,*

---

[1] AT&T has sought judgment on the pleadings on these grounds in the separate actions the counties of Richland and Charleston filed. *See County of Richland v. AT&T Corp., et al.,*

the Complaint alleges that "Defendants should assess a [Primary Rate Interface ("PRI")] with twenty-three channels no fewer than twenty-three 911 service charges," Compl. ¶ 36, with the only exception for customers that "purchased fractional PRI service not delivered by a broadband connection," *id.* ¶ 37. The 911 Act says no such thing. Rather, the law requires AT&T to bill five 911 charges to customers that can modify the number of channels activated to carry outward voice transmissions "without the assistance of" AT&T. S.C. Code § 23-47-50(A)(b). If customers instead require AT&T's assistance to make those modifications, they must pay 911 charges equal to "the number of outward voice transmission paths activated on [that] facility." *Id.* § 23-47-50(A)(a). *Second*, the Complaint alleges that AT&T violated the 911 Act by not billing Voice-over-Internet-Protocol ("VoIP") customers one 911 charge for every active telephone number, with no limit. *See* Compl. ¶¶ 41, 44. But the 911 Act unambiguously imposes a cap of 50 charges per account on both non-VoIP and VoIP customers. And, if there were any ambiguity in the statute, two canons of construction compel the conclusion that the 50-charge cap applies to VoIP customers. Each count in the Complaint, therefore, must be dismissed in part, as each claims violations of the 911 Act that fail as a matter of law.

## BACKGROUND

### A.    South Carolina Local Governments

Under the South Carolina Constitution, "counties, cities, [and] towns" are "political subdivisions" of the State. *Duncan v. County of York*, 228 S.E.2d 92, 95 (S.C. 1976). Each is vested with specific powers and functions as an autonomous entity. *See* S.C. Const. art. VIII. In 1973, the South Carolina Constitution was amended to strengthen the independence of its political subdivisions and to ensure that the "control and management of county and municipal

---

No. 3:18-cv-01295-RMG (D.S.C. Nov. 9, 2018) (Dkt. No. 69); *County of Charleston v. AT&T Corp., et al.*, No. 2:17-cv-02534-RMG (D.S.C. Nov. 9, 2018) (Dkt. No. 134).

affairs" remain "in the hands of *duly elected local officials*."  *Hosp. Ass'n of S.C., Inc. v. County of Charleston*, 464 S.E.2d 113, 117 (S.C. 1995) (emphasis added).

South Carolina counties are "bod[ies] politic and corporate," S.C. Code Ann. § 4-1-10, equipped with broad powers, including the authority "to enact regulations, resolutions, and ordinances," *id.* § 4-9-25.  Counties are also specifically empowered "[t]o sue and be sued," *id.* § 4-1-10(1), such that their elected representatives can enforce county ordinances in the public interest, *see id.* § 4-9-30; *Owens v. Magill*, 419 S.E.2d 786, 789 (S.C. 1992).  Most counties exercise that authority through a duly appointed county attorney, who has specifically prescribed duties and is accountable to the county's elected representatives.

South Carolina municipalities, including cities and towns, are similarly granted wide-ranging authority to "enact regulations, resolutions, and ordinances."  S.C. Code Ann. § 5-7-30.  They also have the power to sue and be sued, *see City Council of Abbeville v. Leopard*, 39 S.E. 248, 250 (S.C. 1901), and they typically vest the authority to bring suits on their behalf in a city or town attorney.

B.     **South Carolina's 911 Act**

1.     The 911 Act authorizes local governments, including counties and municipalities, to impose charges on telephone customers to fund the county- or city-based centers that answer 911 calls and dispatch emergency services.  These call centers are known as Public Safety Answering Points ("PSAPs").  To fund its 911 system, the local government is "authorized," though not required, "to adopt an ordinance to impose a monthly 911 charge upon each local exchange access facility subscribed to by telephone subscribers" within its jurisdiction.  S.C. Code Ann. § 23-47-40(A).  If a local government adopts such an ordinance, the telephone companies that provide service to end-user customers in that jurisdiction bill the 911 charges to

their subscribers and remit the amounts they collect to the local governments (less a 2% administrative fee).  *See id.* § 23-47-50.

2.     In 2010, the South Carolina Legislature substantially amended the 911 Act, in large part to account for changes in communications technology since the statute was first enacted in 1991.  *See* 2010 S.C. Act No. 135 (Apr. 1, 2010) (Ex. A).  Three aspects of those amendments are relevant to Defendants' Partial Motion To Dismiss.

*First*, the Legislature added a provision to address services capable of simultaneously carrying multiple voice and data transmissions over a single line, *see id.* § 3 (amending S.C. Code Ann. § 23-47-50(A)) — services commonly referred to as "multiplex" services.[2]  One of the most commonly purchased types of multiplex service is a PRI, which "provides the capability of 23 simultaneous conversations for each physical exchange line."  *Madison Cty. Commc'ns Dist. v. BellSouth Telecomms., Inc.*, 2009 WL 9087783, at *3 (N.D. Ala. Mar. 31, 2009); *see also* Compl. ¶ 30 (describing PRI as a service that allows customers to have "up to twenty-three simultaneous voice conversations over a single wire connection").  Specifically, a PRI can "activat[e] up to 23 B-channels," each of which "can either provide local exchange voice service or be used as a digital bit stream for data."  *Madison Cty.*, 2009 WL 9087783, at *2-3.  A PRI also has one "D-channel," which "can only be used as digital bit streams for data" and manages the B-channels.  *Id.* at *2.

---

[2] Defendants use the word "multiplex" throughout this Motion as shorthand for a lengthy statutory phrase:  "local exchange access facility that is capable of simultaneously carrying multiple voice and data transmissions."  S.C. Code Ann. § 23-47-50(A).  Parties and courts in other cases involving analogous allegations of 911 charge underbilling have used "multiplex" in the same way.  *See Hamilton Cty. Emergency Commc'ns Dist. v. BellSouth Telecomms., LLC*, 154 F. Supp. 3d 666, 699 (E.D. Tenn. 2016), *reversed and remanded on other grounds*, 852 F.3d 521 (6th Cir. 2017); *BellSouth Telecomms., LLC v. Cobb County*, 802 S.E.2d 686, 689 (Ga. Ct. App. 2017), *cert. granted*, No. S17G2011 (Ga. Apr. 16, 2018).

Originally, the Legislature proposed amending the 911 Act to require *all* customers buying services "capable of simultaneously carrying five or more outgoing 911 voice calls" to pay "five 911 charges."[3]  On March 3, 2010, the South Carolina Senate's Committee on Judiciary proposed revising that language with text that, in substance, sets out the 911 Act's current two-part rule:

> [F]or any individual local exchange access facility that is capable of simultaneously carrying multiple voice and data transmissions, a subscriber must be billed a number of 911 charges equal to:  (a) the number of outward voice transmission paths activated on such a facility in cases where the number of activated outward voice transmission paths can be modified by the subscriber only with the assistance of the service supplier; or (b) five, where the number of activated outward voice transmission paths can be modified by the subscriber without the assistance of the service supplier.[4]

This new language recognizes that multiplex services can carry both voice and data transmissions.  And it also recognizes that not all transmission paths capable of being activated must be activated (and, if activated, need not be activated for outward voice service).  It imposes 911 charges based on who (the customer or the telephone company) can modify the activation status of the individual transmission paths (or B-channels) within a multiplex service:  that is, who can change whether a path is activated (i.e., turned on[5]) for outward voice service (i.e.,

---

[3] S.B. 1147 § 3, 2009-2010 Gen. Assemb., 118th Sess. (S.C. Feb. 9, 2010), https://bit.ly/2OVcdIy; H.B. 4551 § 3, 2009-2010 Gen. Assemb., 118th Sess. (S.C. Feb. 16, 2010), https://bit.ly/2D2GLSm (same).

[4] S.B. 1147 § 3, 2009-2010 Gen. Assemb., 118th Sess. (S.C. Mar. 3, 2010) (Committee Report), https://bit.ly/2SzloMS; *see also id.* (Mar. 4, 2010), https://bit.ly/2Pyc5hQ (adopting Committee amendment).

[5] "Active," "activated," and "activation" are used throughout the 911 Act to mean turned on.  *See*, *e.g.*, S.C. Code Ann. § 23-47-40(B)(4) (allowing certain amounts to be billed to subscribers during the "months before activation of the 911 service"); *id.* § 23-47-60(A) (establishing a maximum database error rate that applies "[u]pon activation [of] enhanced 911 for the public"); *id.* § 23-47-67(E) (addressing the 911 charges due from a customer with a "single active mobile telephone number"); *see also Travelscape, LLC v. S.C. Dep't of Revenue*,

5

capable of calling others or 911), rather than turned off or activated only for data or in-bound-only voice.  The House concurred in the Senate's change on March 11, 2010.[6]

*Second*, the Legislature amended the 911 Act to reiterate that, notwithstanding this new provision addressing multiplex services, the "total number of 911 charges" due from a customer "remains subject to the maximum of fifty 911 charges per account" that had always applied.  *See* 2010 S.C. Act No. 135, § 3 (amending S.C. Code Ann. § 23-47-50(A)); *see also* S.C. Code Ann. § 23-47-50(A) (2009) (capping 911 charges due at "a maximum of fifty local exchange lines [per] account").  This new language was first added to both the House and Senate bills on March 4, 2010.[7]  It ensured that the other provisions in the 2010 amendments did not exclude any customer from the 50-charge cap.

*Third*, the Legislature added a new section to the 911 Act to address 911 charges due from customers buying VoIP service, which the Act did not previously expressly address.[8]  The new section "impose[s] a VoIP 911 charge in an amount *identical* to the amount of the 911 charge imposed on *each* local exchange access facility pursuant to Section 23-47-40(A) and 23-47-50(A)."  2010 S.C. Act No. 135, § 6 (adding S.C. Code Ann. § 23-47-67(A)) (emphases added).  Earlier drafts of this new section in both the House and Senate bills had made the new

---

705 S.E.2d 28, 34 (S.C. 2011) (applying "general rule" that "identical words . . . within the same statute should normally be given the same meaning").

[6] *See* H.B. 4551 § 3, 2009-2010 Gen. Assemb., 118th Sess. (S.C. Mar. 11, 2010), https://bit.ly/2Aq5kGi.

[7] *See* H.B. 4551 § 3, 2009-2010 Gen. Assemb., 118th Sess. (S.C. Mar. 4, 2010), https://bit.ly/2Ar1lt6; S.B. 1147 § 3, 2009-2010 Gen. Assemb., 118th Sess. (S.C. Mar. 4, 2010), https://bit.ly/2Pyc5hQ.

[8] The FCC first authorized states to require VoIP providers to collect 911 charges from VoIP customers in 2005.  *See* First Report and Order and Notice of Proposed Rulemaking, *IP-Enabled Services*, 20 FCC Rcd 10245, ¶ 52 (2005).  And Congress codified the FCC's decision in 2008.  *See* NET 911 Improvement Act of 2008, Pub. L. No. 110-283, § 101, 122 Stat. 2620, 2620-23 (codified in pertinent part in 47 U.S.C. §§ 615a-1, 615b(8)).

VoIP 911 charge "identical" only to the "charge imposed . . . pursuant to Section 23-47-40(A)"[9] — a provision requiring that the 911 charge "be uniform and . . . not vary according to the type of local exchange access facility used."  On March 4, 2010, both the House and Senate added the requirement that the new VoIP 911 charge also be identical to the charge in § 23-47-50(A), including that provision's 50-charge cap, which was added at the same time as the VoIP provision.[10]

## C.     Local 911 Ordinances

Local governments throughout South Carolina, including Plaintiffs (*see* Compl. ¶ 2), have implemented the 911 Act by adopting local ordinances to fund their respective PSAPs. While there are more than 70 distinct PSAPs in South Carolina, *see id.* ¶ 61, some local governments operate, and thus collect charges for, more than one PSAP.  The overwhelming majority of local governments collecting such charges are counties, although some towns (like Summerville) and other political subdivisions operate their own PSAP.  AT&T collects from its customers and remits 911 charges to each of the political subdivisions that operates a PSAP in the parts of South Carolina where AT&T has customers required to pay 911 charges.  In total, during the class period, AT&T has remitted 911 charges to 48 distinct political subdivisions in South Carolina:  40 counties, 6 cities, and 2 towns.  *See* Decl. of Linda Fisher ¶ 3 ("Fisher

---

[9] S.B. 1147 § 5, 2009-2010 Gen. Assemb., 118th Sess. (S.C. Feb. 9, 2010), https://bit.ly/2OVcdIy; H.B. 4551 § 5, 2009-2010 Gen. Assemb., 118th Sess. (S.C. Feb. 16, 2010), https://bit.ly/2D2GLSm.

[10] S.B. 1147 § 6, 2009-2010 Gen. Assemb., 118th Sess. (S.C. Mar. 4, 2010), https://bit.ly/2Pyc5hQ; H.B. 4551 § 5, 2009-2010 Gen. Assemb., 118th Sess. (S.C. Mar. 4, 2010), https://bit.ly/2Ar1lt6.

Decl.").[11]  This figure includes Charleston County and Richland County, which are carved out of the putative class.  *See* Compl. ¶ 60.

### D.     The Class Action Complaint

Plaintiffs' Complaint alleges that AT&T "failed to bill, collect, and remit the appropriate amount of 911 charges to Plaintiffs and the Class as required by South Carolina law."  Compl. ¶ 42.  With respect to customers purchasing multiplex services, Plaintiffs allege that those subscribers are required to pay "no fewer than twenty-three 911 service charges" on any PRI that *could* be configured "simultaneously [to] connect[ ] twenty-three separate users to the 911 system."  *Id.* ¶ 36.  And Plaintiffs allege that a customer purchasing a multiplex service must pay five 911 charges if and only if the customer has purchased "fractional PRI service not delivered by a broadband connection."  *Id.* ¶ 37.  Plaintiffs allege that AT&T violates the 911 Act by not following this interpretation of the Act.  *Id.* ¶ 43.

Plaintiffs also allege that individual customers purchasing VoIP services can be required to pay "thousands" of 911 charges each month because "VoIP can support thousands of [telephone] numbers," *id.* ¶ 40, and, according to Plaintiffs, the 911 Act "requires that Defendants assess VoIP connections by individual telephone number," *id.* ¶ 41.  Plaintiffs again allege that AT&T violates the 911 Act because it does follow their interpretation of the Act.  *See id.* ¶ 44.

Plaintiffs purport to bring claims, under Rules 23(a), (b)(2), and (b)(3), on behalf of a class of "all towns, counties and other local governments in the State of South Carolina that have collected 911 service charges pursuant to S.C. Code Ann. §§ 23-47-10, *et seq.* from October 25, 2015 until the present."  *Id.* ¶ 60.  Plaintiffs exclude Charleston County and Richland County

---

[11] The factual assertions set forth in this declaration are offered solely to support AT&T's Motion To Strike the Class Allegations and are irrelevant to, and expressly excluded from, AT&T's separate Partial Motion To Dismiss.  For the latter, AT&T accepts as true, as it must, all the well-pleaded factual allegations in the Complaint.

from the Class, as each filed a separate action in this Court (through the same counsel representing Plaintiffs here). While Plaintiffs state that "[t]he precise number of Class members is unknown to [them] at the present time," they allege that "[m]embers of the Class are so numerous that joinder is impracticable," *id.* ¶ 61, and that "[t]he Class is readily identifiable from information and records in Defendant's possession and from publicly available records," *id.* ¶ 63.

### STANDARD OF REVIEW

Where a complaint contains putative class allegations that are legally impermissible and defines a class that cannot be certified as a matter of law, the proper remedy is to strike those allegations from the complaint. *See Scott v. Family Dollar Stores, Inc.*, 733 F.3d 105, 110 n.2 (4th Cir. 2013); *see also Adams v. Air Methods Corp.*, 2016 WL 7115905, at *2 (D.S.C. Aug. 12, 2016) ("If the complaint does not plausibly suggest that the named plaintiffs' case is entitled to class certification, then the class allegations may be stricken from the complaint."). Thus, the standard of review in determining whether to strike class allegations is "analogous to the standard of review for motions brought pursuant to Rule 12(b)(6)." *Mungo v. CUNA Mut. Ins. Soc'y*, 2012 WL 3704924, at *4 (D.S.C. Aug. 24, 2012).

As this Court has explained in ruling on a partial motion to dismiss:

Rule 12(b)(6) of the Federal Rules of Civil Procedure permits the dismissal of an action if the complaint fails "to state a claim upon which relief can be granted." Such a motion tests the legal sufficiency of the complaint and "does not resolve contests surrounding the facts, the merits of the claim, or the applicability of defenses. . . . Our inquiry then is limited to whether the allegations constitute 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) (quotation marks and citation omitted). In a Rule 12(b)(6) motion, the Court is obligated to "assume the truth of all facts alleged in the complaint and the existence of any fact that can be proved, consistent with the complaint's allegations." *E. Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000).

*Drayton v. County of Charleston*, 2015 WL 4937358, at *2 (D.S.C. Aug. 17, 2015) (Gergel, J.)

(ellipsis in original) (granting partial motion to dismiss).  However, the Court "need not accept as

true unwarranted inferences, unreasonable conclusions, or arguments" or "the legal conclusions

drawn from the facts."  *E. Shore Markets, Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th

Cir. 2000).

## ARGUMENT

## I.      THE COURT SHOULD STRIKE PLAINTIFFS' CLASS ALLEGATIONS

In seeking to bring claims on behalf of other counties, towns, and local governments,

Plaintiffs and their private lawyers seek to litigate claims that, insofar as they exist, belong to

those sovereign local government entities and their duly elected representatives.  The Complaint

nowhere alleges that Plaintiffs or their counsel sought or obtained the consent of these

independent sovereign entities to pursue claims in their names.  Nor do they allege that they have

complied with local ordinances that govern the ability of these local governments to retain

outside, private counsel.  Without such authorization, neither Plaintiffs nor their private attorneys

have the right to pursue claims on behalf of the absent government entities.

Plaintiffs' request to usurp the role of duly elected representatives and their elected or

appointed government counsel through a class action is unprecedented.  No court (state or

federal) has ever permitted class allegations to be asserted on behalf of the various forms of local

governments in South Carolina.  Plaintiffs' attempt to do so here is plainly foreclosed by state

and federal law.  It is also inconsistent with the requirements of Rule 23(a).  The Court should

therefore strike the class allegations in the Complaint.

**A.     State and Local Laws Vest Counties and Their Duly Appointed Officials with Exclusive Authority To Initiate a Suit on Their Behalf**

The Complaint's assertion (¶ 60) that Plaintiffs' claims are "perfectly suited for class resolution" rests on the erroneous proposition that a class of sovereign governmental entities is no different from a class of private entities. But local governments are not the same as corporations. *See Newman v. Richland Cty. Historic Pres. Comm'n*, 480 S.E.2d 72, 74 (S.C. 1997). And consideration of their sovereign interests requires striking the class allegations.

**1.**     Allowing private lawyers for one county or town to bring claims on behalf of other South Carolina local governmental entities interferes with those entities' sovereign authority to enforce their local ordinances and to perform their fundamental role in tax collection. The South Carolina Supreme Court has explained that, "[i]f the counties are to remain units of government, the power to function must exist at the county level." *Knight v. Salisbury*, 206 S.E.2d 875, 877 (S.C. 1974). Few things are more critical for maintaining that power to function than the "authority to decide when a claim should or should not be brought." *Berry v. McLeod*, 492 S.E.2d 794, 800 (S.C. Ct. App. 1997) (per curiam).

As such, "the duty of determining when a suit should be brought [is] vested in the [governing body of the local government], [and] it cannot be controlled" by others, except in the most extreme of circumstances. *Ex parte Hart*, 2 S.E.2d 52, 54 (S.C. 1939); *see also Berry*, 492 S.E.2d at 800 ("[t]he authority to decide when a claim should or should not be brought by a governmental entity is vested with the entity," and "[a] court will not . . . interfere" with that authority absent "illegality, fraud, or clear abuse of authority" in "unjustifiably refus[ing] to assert the claim"). Here, the named Plaintiffs "fail[] to allege any factual basis for the assertion that the [absent putative class members] abused their discretion in deciding not to initiate this

litigation." *Id.* at 801. Absent such an abuse of discretion, no local government — including the absent class members — can be "compelled" to bring a suit. *Ex parte Hart*, 2 S.E.2d at 54.

Protecting against the infringement of local government authority is particularly important where, as here, the action involves the core sovereign function of tax collection. The charges the 911 Act imposes are taxes because they are "an enforced contribution to provide for the support of [the] government" service of providing the general public with access to 911 and the prompt dispatch of emergency services; they are not charged in exchange for "a particular benefit to the payer." *BellSouth Telecomms., Inc. v. City of Orangeburg*, 522 S.E.2d 804, 806 (S.C. 1999). Anyone who dials 911 while in South Carolina — including travelers and tourists using cellphones and individuals who purchased "'911-only' [cell]phones that are configured solely to make emergency calls"[12] — will have their call answered and emergency services dispatched. The 911 operator does not check first to see if the caller has paid that local government's 911 charge. For these reasons, the vast majority of courts in other jurisdictions to consider the issue have held that 911 charges are taxes.[13] And the federal government has concluded that state 911 charges like those in South Carolina are taxes for the same reasons.[14]

---

[12] Notice of Proposed Rulemaking, *911 Call-Forwarding Requirements for Non-Service-Initialized Phones*, 30 FCC Rcd 3449, ¶ 1 n.2 (2015) (describing the FCC's still-effective rule requiring wireless carriers to deliver 911 calls from such devices, even though they lack a valid service plan and the carrier does not bill the user).

[13] *See, e.g.*, *Phone Recovery Servs., LLC v. Qwest Corp.*, 919 N.W.2d 315, 324 (Minn. 2018) (finding that 911 charges are taxes and that "there is no direct connection between paying the 911 fee . . . and receiving goods or services from any governmental entity"); *Phone Recovery Servs., LLC v. Verizon of New Eng., Inc.*, 2015 WL 8331983, at *6 (Mass. Super. Ct., Suffolk Cty., Oct. 27, 2015), *aff'd on other grounds*, 102 N.E.3d 968 (Mass. 2018); *TracFone Wireless, Inc. v. Comm'n on State Emergency Commc'ns*, 397 S.W.3d 173, 175 n.3 (Tex. 2013); *Bay Area Cellular Tel. Co. v. City of Union City*, 75 Cal. Rptr. 3d 839, 841 (Ct. App. 2008); *Kessler v. Hevesi*, 846 N.Y.S.2d 56, 57 (App. Div. 2007).

[14] *See* U.S. Gen. Accounting Office, *National Weather Service — Alabama 911 Service Charge and Utility Service Use Tax*, B-300737, at 4-6 (Comp. Gen. June 27, 2003), https://bit.ly/2Dabb5f.

It is a bedrock principle "that the sovereign right to levy and collect taxes grows out of the necessities of the government — an urgent necessity." *Ex parte Lynch*, 1881 WL 5943, at *3 (S.C. 1881). "The right to tax is co-equal with all governments. It springs out of the organization of the government." *Id.* If Plaintiffs prevail in this case, they will expose the citizens of other sovereign jurisdictions to increased tax liability, all without the involvement of their duly elected representatives. That intrusion on those entities' core sovereign functions runs afoul of South Carolina law and cannot be sustained.

2.      The class allegations also fail as a matter of law because Plaintiffs have not complied with the local ordinances of the unnamed members of the putative class that govern litigation by those government entities. Most, if not all, counties in South Carolina employ a county attorney to serve as its chief legal officer, and many grant that attorney exclusive, or nearly exclusive, authority to represent the county's interests in court and pursue litigation on its behalf. Many cities and towns vest similar authority in a city or town attorney. The authority of these government attorneys to represent the counties, cities, and towns, and to control litigation on their behalf, cannot lawfully be usurped by private lawyers retained by a different local entity.

While the process for selecting and retaining the government attorney may vary, in most instances the attorney's specific responsibilities are set forth in the government entity's ordinances. For example, the Aiken County Code provides that "the county attorney . . . *shall* be the chief legal officer of the county" and "*shall* be . . . retained from the membership of the county bar by the county council." Aiken County Code § 2-181 (emphases added). In that role, "[t]he county attorney *shall represent* and defend *the county* and all of its officers in any of the courts of this state or of the United States" and, among other things, "shall bring *all actions and proceedings* that may be necessary to enforce payment and collection of any claims existing in

13

favor of the county or of any of its officers, boards or agencies." *Id.* § 2-183 (emphases added). The ordinance further provides that "[n]o officer, board, commission, committee or agency in the county . . . may employ an attorney other than the county attorney or agree to pay for services out of public funds *without first obtaining the council's approval* of the employment of such attorney." *Id.* § 2-187 (emphasis added).

The Anderson County Code similarly provides that "[t]he county administrator shall appoint the county attorney," who "*shall* . . . [r]epresent[ ] . . . the county, its departments, employees, boards, commissions and agencies, in *all legal matters*, whether or not an action has been commenced." Anderson County Code §§ 2-177(a), 2-178(b)(1) (emphases added). The Colleton County Code is to the same effect: "The council *shall* designate and contract an attorney . . . to serve as the county attorney. . . . He shall participate in any litigation involving the county." Colleton County Code § 2.30.020(D) (emphasis added). The same is true of many other counties that Plaintiffs seek to represent.[15]

City ordinances likewise vest exclusive authority in the city attorney. For example, the City Code of putative class member Goose Creek City provides that "[a] City Attorney shall be

---

[15] *See*, *e.g.*, Darlington County Code § 2-56 ("[t]he county council shall retain a qualified attorney . . . to serve as the county attorney," who "shall . . . participate in any litigation involving the county"); Greenville County Code § 2-151 ("[T]he County Attorney shall be appointed by the County Council . . . . He shall perform, or be responsible for, all legal services required by the county government . . . . He shall have such assistants as may be authorized by the County Council."); Jasper County Code § 2-69 ("County attorney. The council shall employ a person licensed to practice law in the State of South Carolina and who is not a member of the county council. . . . No county agency, commission, board, department, or committee shall employ an attorney other than the county attorney unless specifically authorized by the county council."); Orangeburg County Code §§ 2-221, 2-225 ("The county attorney shall be appointed by the council . . . . No officer, board, commission, committee or agency in the county receiving any county funds or appointed in whole or in part by the council or the county legislative delegation may employ an attorney other than the county attorney or agree to pay for services out of public funds without first obtaining the county attorney's approval of the employment of such attorney.").

appointed by the City Council."  Goose Creek City Code § 32.45.  It goes on to mandate that "[t]he City Attorney *shall prosecute* and defend *all civil actions in which the city may be a party* and shall prosecute on behalf of the city, all criminal cases in the Municipal Court whenever requested to do so by the Mayor or Council."  *Id.* § 32.51 (emphases added).[16]  The use of the word "shall" in all of these enactments makes them mandatory.  *Wigfall v. Tideland Utils., Inc.*, 580 S.E.2d 100, 105 (S.C. 2003).

None of the attorneys listed on the Complaint purports to be a duly elected, appointed, or approved *government attorney* for any of the absent class members.  They therefore have no lawful authority to act on behalf of absent government entities.  To allow private counsel to bring litigation on behalf of the absent local governments would deprive them of their sovereign authority "to control and manage [their own] affairs," *Ex parte Greenville County*, 2 S.E.2d 47, 51 (S.C. 1939), and divest official government attorneys "of the very labors which are devolved upon [them] by the law, and which [they] w[ere] [appointed by duly elected officials] to perform," *Merced County v. Cook*, 52 P. 721, 723 (Cal. 1898).  Because only duly authorized government attorneys may represent the absent class members and pursue litigation on their behalf, the class allegations in the Complaint must be stricken.

It is of no consequence that the putative class members would have the future opportunity to opt *out* of the putative Rule 23(b)(3) class.  As an initial matter, there is no right to opt out of a Rule 23(b)(2) class, which the Complaint also seeks to certify (¶ 67).  Moreover, the local ordinances discussed above grant exclusive authority to government attorneys to conduct *all*

---

[16] *See also*, *e.g.*, Cayce City Code §§ 2-201, 2-203 ("[t]he city council shall elect an officer whose designation shall be city attorney," who "may prosecute and defend all actions and appear in behalf of the city and its officers in all legal proceedings in which it or they or any of them may be a party or have any interest, or in which its officers may be concerned on account of their lawful official acts").

litigation; none contemplates post hoc approval of legal proceedings that have already transpired. More fundamentally, to allow Plaintiffs to compel these sovereign entities to take affirmative action to preserve their authority *not to sue* imposes an undue burden on their sovereignty. That is why no court in South Carolina appears to have ever certified a class of counties and municipalities.

Nor is it clear that counsel from Motley Rice — the only attorneys listed on the Complaint — have authority to represent the *named Plaintiffs*. While public minutes reflect the approval of Motley Rice's retention,[17] those approvals do not appear to comply with the relevant Town and County ordinances. Under the Town of Summerville Code, except where the Town's insurer provides the Town's counsel, "[i]t *shall be the duty of the town attorney* to enter an appearance in all actions . . . and *to conduct all suits* . . . in which the town is a party." Town of Summerville Code § 2-262 (emphases added). Similarly, under the County of Dorchester Code, "[t]he *county attorney*," or "a member of the attorney's firm," "*shall . . . [p]articipate in any litigation* involving the county." Dorchester County Code § 2-97(f) (emphases added). The Motley Rice attorneys on the Complaint are not the town attorney or the county attorney (or members of his firm). Non-compliance with these statutes would require dismissal of the Complaint. *See*, *e.g.*, *Greenville County*, 2 S.E.2d at 51-52 (dismissing a claim instituted on behalf of a local government without proper authority); *Town of Claverack v. Brew*, 277 A.D.2d 807, 809-10 (N.Y. 2000) (same); *see also Olds v. City of Goose Creek*, 818 S.E.2d 5, 8, 12 (S.C. 2018) (holding that "the plain language of [a city's] particular ordinance" must be enforced, even

---

[17] *See* Town of Summerville, Town Council Meeting Minutes (Oct. 18, 2018), https://bit.ly/2F6EHsP; Dorchester County, County Council Meeting Minutes (Sept. 4, 2018), https://bit.ly/2AtyVhT.

when both the "City Administrator and City Council" believe a contrary interpretation of the ordinance is lawful).

3.      South Carolina is not alone in protecting local governments' authority to control the legal actions brought on their behalf.  Courts in other jurisdictions have consistently rejected efforts to use Rule 23 to bring putative class allegations on behalf of counties and governmental entities.  For example, in *Dallas County v. MERSCORP, Inc.*, 2012 WL 6208385 (N.D. Tex. Dec. 13, 2012), several counties attempted to bring class allegations on behalf of all Texas counties against several defendants that allegedly had defrauded each county's public recording system for deeds.  Texas law similarly dictated the procedures a county had to employ to select outside counsel to represent it in a suit.  Because the Complaint failed to allege that "the procedural requirements that Texas counties must satisfy prior to hiring outside counsel to represent them in litigation" had been satisfied, the court concluded that the class action could not be sustained under Texas law and struck the class allegations.  *Id.* at *10.

In *MERSCORP*, the plaintiffs argued that the counties could go through the processes in their ordinances in the future, and thereby consent (after the fact) to representation by the outside lawyers that filed suit.  The district court rejected that argument, holding that such a regime "would create a class that functions as an 'opt in' class," which is prohibited under Rule 23.  *Id.*; *see also Parker v. Asbestos Processing, LLC*, 2015 WL 127930, at *9 (D.S.C. Jan. 8, 2015) (holding that an "opt-in" class is impermissible under Rule 23).

A federal district court in the Eastern District of Michigan similarly struck putative claims on behalf of governmental entities with local ordinances almost identical to the ordinances at issue here.  In *In re Automotive Parts Antitrust Litigation*, No. 2:14-cv-00106 (E.D. Mich.), five local government entities brought claims against various manufacturers for allegedly

17

engaging in a conspiracy to fix prices on wire harnesses, which are a component of automobiles. Those local governments sought to bring those claims also on behalf of Rule 23(b)(2) and 23(b)(3) classes comprising "other similarly situated . . . local government subdivisions . . . , including but not limited to municipalities, cities, counties and towns." Op. and Order at 2, *Automotive Parts*, No. 2:14-cv-00106 (E.D. Mich. Apr. 30, 2015) (Dkt. No. 61). The defendants moved to strike the class allegations, citing the applicable ordinances and city and municipal charters specifying how the various governmental entities could exercise their authority to bring suit. The court granted that motion, holding that "the issue of representation by private counsel poses a legal impediment to the class allegations." *Id.* at 15.

Other federal courts have reached this same result. *See, e.g.*, *Ackal v. Centennial Beauregard Cellular, LLC*, 700 F.3d 212, 215 (5th Cir. 2012) (reversing trial court's certification of a class including 299 governmental entities made up of "parish police juries, parish school boards, and other local boards and commissions," because state law required the governmental entities to meet certain criteria before they could retain private representation). As have state courts, concluding that such claims violate state law. *See, e.g.*, *Southwest Gas Corp. v. Third Judicial Dist. Court*, 449 P.2d 259, 260 (Nev. 1969) (rejecting Nevada district attorney's putative class action on behalf of other counties, because it is "patently clear that the district attorney has the power to act solely on behalf of his own county, and for no other county"); *Town of Claverack*, 277 A.D.2d at 809-10 (holding that, once defendants asserted that "the litigation had not been brought by the proper Town entity or official, the onus was on plaintiff to come forward with evidence establishing that the action was authorized," and dismissing the action).

18

**B.     Plaintiffs' Proposed Class Is Not Sufficiently Numerous To Merit Class Treatment Under Rule 23(a)(1)**

The Court should strike the class allegations for a second, independent reason:  Plaintiffs will never be able to satisfy Rule 23(a)'s numerosity requirement.  Plaintiffs offer the conclusory assertion that "[m]embers of the Class are so numerous that joinder is impracticable."  Compl. ¶ 61.  But it is well established that "[t]he mere allegation that [a] class is too numerous to make joinder practicable" is "not sufficient" to satisfy the numerosity requirement."  *Fleming v. Travenol Labs., Inc.*, 707 F.2d 829, 833 (5th Cir. 1983); *see also Dennis v. Norwich Pharmacal Co.*, 1973 WL 141, at *3 (D.S.C. Feb. 26, 1973) (same).  The class allegations should be stricken because there is no possibility that Plaintiffs will be able to make the requisite showing.

AT&T has reviewed its records and determined that it collects 911 charges in every part of South Carolina where it provides telephone service and remits those charges to a total of 48 distinct entities.  *See* Fisher Decl. ¶ 3.  Because Charleston County and Richland County are carved out of the class definition, *see* Compl. ¶ 60, the maximum size of Plaintiffs' putative class is 46 members, including the two named Plaintiffs.  Even if a class action of independent sovereign governmental entities could be sustained, the proposed class is not sufficiently numerous.

To satisfy the numerosity requirement of Rule 23(a), a plaintiff must show that joinder is impracticable.  *See Lienhart v. Dryvit Sys., Inc.*, 255 F.3d 138, 146 (4th Cir. 2001).  While "there is no magic number threshold," *Gray v. Hearst Commc'ns, Inc.*, 2010 WL 11531121, at *10 (D.S.C. Feb. 1, 2010), *aff'd*, 444 F. App'x 698 (4th Cir. 2011), the Fourth Circuit has held that classes larger than 46 purported members are *not* sufficiently numerous to satisfy Rule 23(a)(1).  *See Roman v. ESB, Inc.*, 550 F.2d 1343, 1348-49 (4th Cir. 1976) (en banc) (holding that a purported class of 53 members was not sufficiently numerous to justify class treatment); *Kelley*

*v. Norfolk & W. Ry. Co.*, 584 F.2d 34, 35-36 (4th Cir. 1978) (per curiam) (holding that a purported class of 67 members was not sufficiently numerous to justify class treatment).  And federal courts nationwide have found that classes much larger than 46 are not numerous enough. *See*, *e.g.*, *Jaynes v. United States*, 69 Fed. Cl. 450, 454-56 (2006) (putative class of 258 plaintiffs not sufficiently numerous); *Hum v. Dericks*, 162 F.R.D. 628, 632, 634-35 (D. Haw. 1995) (putative class of 200 members not sufficiently numerous); *Minersville Coal Co. v. Anthracite Exp. Ass'n*, 55 F.R.D. 426, 428 (M.D. Pa. 1971) (putative class of 330 plaintiffs not sufficiently numerous); *City & County of Denver v. Am. Oil Co.*, 53 F.R.D. 620, 628, 638 (D. Colo. 1971) (putative class of 126 plaintiffs not sufficiently numerous); *Utah v. Am. Pipe & Constr. Co.*, 49 F.R.D. 17, 21 (C.D. Cal. 1969) (putative class of 350 plaintiffs not sufficiently numerous).

Beyond sheer numbers, the "practicability of joinder depends on many factors, including, for example, . . . ease of identifying its numbers and determining their addresses, facility of making service on them if joined and their geographic dispersion," *George v. Duke Energy Ret. Cash Balance Plan*, 259 F.R.D. 225, 231 (D.S.C. 2009), as well as the "size of individual claims, financial resources of class members, and the ability of claimants to institute individual suits," 1 William B. Rubenstein, *Newberg on Class Actions* § 3:12, at 206 (5th ed. 2011) (collecting cases).  None of these factors cuts in favor of class certification.

The putative class is "readily identifiable" from public records and centrally located in South Carolina.  *See* Compl. ¶ 63.  Moreover, multiple counties around the country — big and small — have exercised their sovereign authority to pursue claims of alleged 911 underbilling in their own name and through their own duly selected legal counsel.  This includes more than 15 counties in Pennsylvania, more than 15 counties and cities in Georgia, at least 6 counties and

cities in Alabama, and at least 15 counties in Tennessee.[18]  These cases demonstrate that any interested local government can easily sue on its own or can join together with other like-minded local governments to do so.  There is nothing in the nature of the claims that would make it difficult for any absent local government entity from suing in its own name, if it believed such a suit was warranted in the exercise of its sovereign authority.

## II.    THE COMPLAINT FAILS, IN PART, TO STATE A CLAIM FOR WHICH RELIEF CAN BE GRANTED

### A.    The Complaint's Claims About How the 911 Act Requires AT&T To Bill Their Multiplex Customers Fail as a Matter of Law

The Complaint fails to state a claim that AT&T "failed to bill, collect, and remit the appropriate amount of 911 charges" due from its multiplex customers in the manner the Complaint contends is required.  Compl. ¶¶ 42-43.

The Complaint alleges that AT&T was required to bill five 911 charges only to customers that purchased "fractional PRI service not delivered by a broadband connection."  *Id.* ¶ 37.  And the Complaint additionally contends that AT&T was required to bill all other multiplex customers "no fewer than twenty-three 911 service charges" because those services *could* be configured "simultaneously [to] connect[ ] twenty-three separate users to the 911 system."  *Id.* ¶ 36.  These legal allegations are inconsistent with the plain language of the 911 Act.

---

[18] The cases filed in Pennsylvania, Alabama, and Georgia are cited in Plaintiff's Response to the Court's July 13, 2018 Order, *County of Charleston v. AT&T Corp., et al.*, No. 2:17-cv-02534-RMG (D.S.C. July 16, 2018) (Dkt. No. 88).  In addition to the listed Georgia cases, another eight Georgia counties and cities have entered into tolling agreements with the defendants and intend to file suit if the Georgia Supreme Court holds that such suits can go forward.  *See, e.g.*, Tolling Agreement, *Cobb County, et al. v. Comcast Bus. Commc'ns, LLC, et al.*, Nos. 1:16-CV-00495-AT & 1:17-CV-00035-AT (N.D. Ga. Oct. 13, 2017) (Dkt. No. 26-1).  Charleston County did not list any of the suits filed in Tennessee, one of which was brought by 15 counties (many of which also filed other suits in their own names).  *See* Compl., *Bedford Cty. Emergency Commc'ns Dist., et al. v. Level 3 Commc'ns, LLC*, No. 1:14-cv-376 (E.D. Tenn. Dec. 31, 2014) (Dkt. No. 1).

As a result of the 2010 amendment, the 911 Act now contains a two-part rule that governs the 911 charges due from a customer that purchases an "individual local exchange access facility that is capable of simultaneously carrying multiple voice and data transmissions," or multiplex line.  S.C. Code Ann. § 23-47-50(A).  Specifically, that section provides that a multiplex customer

> must be billed a number of 911 charges equal to:  (a) the number of outward voice transmission paths activated on such a facility in cases where the number of activated outward voice transmission paths can be modified by the subscriber only with the assistance of the service supplier; or (b) five, where the number of activated outward voice transmission paths can be modified by the subscriber without the assistance of the service supplier.

*Id.*  Applying § 23-47-50(A), properly interpreted, the Complaint fails to state a claim insofar as it alleges that multiplex services must be billed in a manner inconsistent with the plain language of the text.[19]

**1.     "Without the assistance of the service supplier."**  The 911 Act requires a multiplex customer to pay five 911 charges when that customer can "modif[y]" the "number of activated outward voice transmission paths . . . without the assistance of the service supplier." S.C. Code Ann. § 23-47-50(A)(b).  These statutory terms have plain meanings.  "Activated," consistent with its use throughout the statute, means turned on.  *See supra* note 5.  "Outward" means capable of calling other customers or 911.  "Voice" means voice, as opposed to just data. And a "transmission path" is a path capable of carrying voice or data.  Finally, "assistance" means help:  does the customer require the telephone company's help to change the activation

---

[19] For the avoidance of doubt, AT&T does not seek dismissal of the entire Complaint. Rather, AT&T seeks partial dismissal of all counts insofar as they allege AT&T must bill its multiplex customers 23 911 charges, regardless of how many channels on that multiplex service are activated for outward voice transmission, *see* Compl. ¶ 36, and may only bill five 911 charges where the customer purchases "fractional PRI service not delivered by a broadband connection," *id.* ¶ 37.

status of a B-channel?  Thus, a customer buying a multiplex service must pay five 911 charges where the customer does not need the telephone company's assistance to change whether individual B-channels are turned on for use for outbound voice service or, instead, are turned off or turned on only for data or inbound-only voice service.

The Complaint alleges, however, that § 23-47-50(A) applies only where a customer "has purchased fractional PRI service not delivered by a broadband connection."  Compl. ¶ 37.  Nothing in the statute supports this allegation.  The limitation set forth in the Complaint is found nowhere in § 23-47-50(A), which does not mention "fractional PRI service" or a "broadband connection." Courts "are not at liberty, under the guise of construction, to alter the plain language of [a] statute by adding words which the Legislature saw fit not to include." *Ferguson Fire & Fabrication, Inc. v. Preferred Fire Prot., LLC*, 762 S.E.2d 561, 567 (S.C. 2014) (alteration in original).  Instead, the court's "duty is to apply the statute according to its own terms." *Id.*

Section 23-47-50(A), by its plain terms, sets forth two different rules for the 911 charges to be imposed on multiplex services.  Which rule applies turns on *who* can modify the number of paths on a multiplex service that are activated for outward voice transmission — the customer or the telephone company — and not on *how much* of a multiplex service the customer has purchased the right to use (fractional, or otherwise).  As long as the customer does not need the telephone company's assistance to switch the activation status of the B-channels, that customer has the power to "modif[y]" the "number of activated outward voice transmission paths." Where the customer has that power, the number of 911 charges due is set, by statute, at five.

The Complaint's allegations about the meaning of § 23-47-50(A)'s five-charge rule conflict with that provision's plain language.  And the Complaint does not allege *any* facts indicating that AT&T underbilled its multiplex customers under § 23-47-50(A), as properly

interpreted.  Accordingly, each count in the Complaint must be dismissed insofar as it alleges

that AT&T must bill (and has failed to bill) more than five 911 charges for any multiplex service

where the customer has the power to modify the number of activated outward voice transmission

paths without AT&T's assistance.

2.     **"With the assistance of the service supplier."**  Where "the number of activated

outward voice transmission paths" on a multiplex service "can be modified . . . only with the

assistance of" the telephone company, the customer must pay one 911 charge for each "outward

voice transmission path[ ] activated on such" a service.  S.C. Code Ann. § 23-47-50(A)(a).

Again, this follows plainly from the text of the statute.  Therefore, and solely by way of example,

where this provision applies, a customer that has purchased a PRI on which only 12 of the

B-channels are activated for outbound voice transmissions — with the other 11 B-channels

activated for data or inbound-only voice, or not activated at all — must pay only 12 911 charges

each month for that PRI under this provision.  Should the customer later ask the telephone

company to activate four more B-channels for outward voice transmission, the number of 911

charges would increase to 16.

The Complaint, however, alleges that § 23-47-50(A)(a) requires AT&T to "assess a PRI

with twenty-three channels no fewer than twenty-three 911 service charges" — without regard to

the number of channels actually activated on a PRI for outward voice transmission — "because

the PRI is *capable* of simultaneously connecting twenty-three separate users to the 911 system."

Compl. ¶ 36.  That legal assertion is contradicted by the plain language of the statute.  Section

23-47-50(A)(a) of the 911 Act does not impose 911 charges based on the number of channels

that have the *capability* of being activated for outward transmission.  Rather, it imposes 911

charges based on the *actual* number of "*outward voice* transmission paths *activated* on such a

24

facility." S.C. Code Ann. § 23-47-50(A)(a) (emphases added). Indeed, the statute not only specifies that a channel must be "activated" for "outward voice" transmissions, but also recognizes that channels can be used for "data transmissions" rather than voice. *Id.* § 23-47-50(A). The Complaint's contrary reading, which would require a multiplex customer to pay 23 911 charges regardless of how its service is configured, renders these terms superfluous in violation of basic principles of statutory interpretation. *See CFRE, LLC v. Greenville Cty. Assessor*, 716 S.E.2d 877, 881 (S.C. 2011) (stating that South Carolina courts "must read the statute so that no word, clause, sentence, provision or part shall be rendered surplusage, or superfluous").

Again, the Complaint's allegations about the meaning of § 23-47-50(A)(a) find no support in the plain text of the statute. Nor does the Complaint allege any facts to support the claim that AT&T violated § 23-47-50(A)(a), as properly interpreted. Accordingly, each count of the Complaint must be dismissed insofar as it alleges that AT&T must bill (and has failed to bill) 23 911 charges for any multiplex service that is capable of simultaneously supporting 23 outward voice channels regardless of whether such channels have been activated for outward voice transmission.

**B.** **The Complaint's Claim That the 911 Act Requires Defendants To Charge Their VoIP Customers More Than 50 911 Charges Per Account Fails as a Matter of Law**

According to the Complaint, AT&T's VoIP customers are not subject to § 23-47-50(A)'s 50-charge cap and, instead, potentially can be required to pay "thousands" of 911 charges each month. Compl. ¶ 40. That legal conclusion about how the 50-charge cap applies to VoIP customers conflicts with the plain language of the statute.

**1.** The 911 Act expressly sets the "total number of 911 charges" that any customer must pay each month at a "maximum of fifty 911 charges per account." S.C. Code Ann. § 23-

47-50(A). That cap applies to customers purchasing an "individual local exchange access facility," *id.*, which is a facility that provides "access from" the customer's "premises" to the "telephone system" of the telephone company selling the service, *id.* § 23-47-10(17). That same cap applies to customers purchasing VoIP services, which are subject to a 911 charge that is "in an amount identical to the amount of the 911 charge imposed on each local exchange access facility pursuant to Section 23-47-40(A) and 23-47-50(A)." *Id.* § 23-47-67(A). The express cross-reference to § 23-47-50(A) — which, as shown above, both the House and Senate added during the drafting process at the same time they added to § 23-47-50(A) the language reiterating the 50-charge cap — extends the 50-charge cap to VoIP customers.

The 911 charge that § 23-47-50(A) imposes on the fifty-first (and each subsequent) local exchange access facility on a customer's account is $0. *See Verizon v. FCC*, 740 F.3d 623, 657 (D.C. Cir. 2014) (a cap that "bar[s]" a party "from charging" for a service sets "a price of $0" for that service). For the VoIP 911 charge imposed on "***each*** VoIP service line" to be "in an amount identical to the amount of the 911 charge imposed on ***each*** local exchange access facility," *id.* § 23-47-67(A)-(B) (emphases added), the VoIP 911 charge on the fifty-first (and each subsequent) VoIP service line on a customer's account must also be $0. "The ordinary meaning of the word 'each' is '*every one* of two or more . . . things considered separately." *Dickenson-Russell Coal Co. v. Sec'y of Labor*, 747 F.3d 251, 258 (4th Cir. 2014). A customer can only pay a 911 charge on "every one" of its VoIP service lines that is "identical" to the charge that a non-VoIP customer would pay on "every one" of its local exchange access facilities if the 50-charge cap applies equally to VoIP and non-VoIP customers.

Any other reading of § 23-47-67(A) would be inconsistent with the express incorporation in that section not only of § 23-47-50(A), but also of § 23-47-40(A), which requires the 911

26

charge to "be uniform" and "not [to] vary according to the type of" service the customer purchases. Because a "statute must receive such construction as will make all of its parts harmonize with each other," each of these provisions must be read together. *Davis v. County of Greenville*, 470 S.E.2d 94, 96 (S.C. 1996); *see also Olds*, 818 S.E.2d at 12 ("Statutes must be read as a whole and sections which are part of the same general statutory scheme must be construed together and given effect, if it can be done by any reasonable construction."). Reading them together confirms that the 50-charge cap applies to VoIP and non-VoIP customers alike.

The Complaint's allegation that an AT&T VoIP customer with "thousands of [telephone] numbers" is required to pay thousands of 911 charges each month, Compl. ¶ 40, thus conflicts with the plain language of the 911 Act by making the VoIP 911 charge imposed on each VoIP service line not "identical" to the 911 charge imposed on "each" local exchange access facility and also not "uniform." The Court should therefore dismiss each count of the Complaint insofar as it alleges that Defendants are liable because they did not bill more than 50 911 charges per month to any VoIP customer.

2.    The 911 Act certainly does not *unambiguously* state that VoIP customers must pay an uncapped number of 911 charges. Even if the Court does not agree with AT&T that the statute unambiguously applies the 50-charge cap to VoIP customers, AT&T offers a reasonable interpretation of § 23-47-67(A), based on its explicit cross-reference to § 23-47-50(A), cases interpreting the ordinary meaning of the word "each," and authority finding that a prohibition on imposing charges is the same as setting a rate of $0.[20]   Therefore, at a minimum, § 23-47-67(A)

_____

[20] The Complaint twice alleges that Sprint bills 911 charges for VoIP service in compliance with the 911 Act. *See* Compl. ¶¶ 45, 52. That allegation refers to a declaration from Sprint — which Plaintiffs' lawyers submitted in other cases before this Court — showing that Sprint, like AT&T, interprets § 23-47-67(A) to apply the "statutory cap on 911 charges" to its VoIP customers with "more than 50 VoIP lines." Aff. of Kara Gerwin ¶ 8, attached as Ex. A to Pl.'s

is ambiguous. *See Newport News Shipbuilding & Dry Dock Co. v. Brown*, 376 F.3d 245, 248 (4th Cir. 2004) (explaining that a statute "is ambiguous" if "it lends itself to more than one reasonable interpretation"); *S.C. Dep't of Soc. Servs. v. Lisa C.*, 669 S.E.2d 647, 652 (S.C. Ct. App. 2008) ("If a statute is susceptible to two reasonable interpretations, it is ambiguous."). And under two separate canons of construction, this Court must construe those ambiguities against Plaintiffs and apply the 50-charge cap to VoIP and non-VoIP customers alike.

*First*, the canon of constitutional avoidance applies because federal law would preempt South Carolina's 911 Act if it capped 911 charges due from non-VoIP customers at 50 per account per month, but left VoIP customers potentially liable for thousands of 911 charges each month. The South Carolina Supreme Court has long held that "[c]onstitutional constructions of statutes are not only judicially preferred, they are mandated; a possible constitutional construction must prevail over an unconstitutional interpretation." *Henderson v. Evans*, 232 S.E.2d 331, 333-34 (S.C. 1977); *see also Davis*, 470 S.E.2d at 96 ("All statutes are presumed constitutional and will, if possible, be construed so as to render them valid."); *State v. 192 Coin-Operated Video Game Machs.*, 525 S.E.2d 872, 883 (S.C. 2000) ("A possible constitutional construction of a statute must prevail over an unconstitutional interpretation.").

In 2008, Congress limited state authority to require VoIP customers to pay 911 charges. Specifically, Congress enacted a statute providing that, "[f]or each class of subscribers to IP-enabled voice [(i.e., VoIP)] services, the [911] fee or charge may not exceed the amount of any such fee or charge applicable to the same class of subscribers to telecommunications services."

---

Resp. to Defs.' Jt. Mot. for J. on the Pleadings, *County of Richland v. AT&T Corp., et al.*, No. 3:18-cv-01295 (D.S.C. Dec. 7, 2018) (Dkt. No. 74-1). In ruling on a 12(b)(6) motion, a court may consider "any documents . . . incorporated in the complaint," such as the Sprint declaration that is the source of Plaintiffs' allegations about Sprint. *Williams v. Preiss-Wal Pat III, LLC*, 17 F. Supp. 3d 528, 532 (D.S.C. 2014).

47 U.S.C. § 615a-1(f)(1). The word "amount" as used in § 615a-1(f)(1) is reasonably read to refer not merely to the rate that is used to calculate the total amount in 911 charges due from a customer, but also to the total amount itself. *See*, *e.g.*, *Webster's Third New International Dictionary* 72 (2002) (first definition of "amount" when used as a noun: "the total number or quantity: AGGREGATE"). Reading "amount" in § 615a-1(f)(1) to refer to the total charged is also consistent with Congress's clearly articulated federal policy of "encourag[ing] the deployment on a reasonable and timely basis of advanced telecommunications capability to all Americans." 47 U.S.C. § 1302(a); *see also Nat'l Cable & Telecomms. Ass'n, Inc. v. Gulf Power Co.*, 534 U.S. 327, 339 (2002) (recognizing "Congress' general instruction to the FCC to 'encourage the deployment' of broadband Internet capability"); First Report and Order and Notice of Proposed Rulemaking, *IP-Enabled Services*, 20 FCC Rcd 10245, ¶ 31 (2005) ("recogniz[ing] the nexus between VoIP services and accomplishing the goals of section 706" of the Telecommunications Act of 1996 (later codified at 47 U.S.C. § 1302(a))).

The Complaint's formalistic reading of the 911 Act unquestionably puts it within the express preemptive scope of § 615a-1(f)(1). For example, a business in Dorchester County with a large number of employees and 1,000 telephone numbers would pay no more than 50 911 charges per month — a total of $49.50[21] — when it was purchasing traditional, non-VoIP telephone services, such as PRIs, capable of supporting those employees and telephone numbers.[22] But, according to Plaintiffs, if that same business were to switch to VoIP service to

---

[21] *See* Compl. ¶ 2 (noting that "Dorchester County's current 911 service charge is $0.99").

[22] The Complaint alleges that "a single . . . PRI can support between 115 and 184 working telephone numbers." Compl. ¶ 31. A business can purchase a single PRI to support more than 23 telephone numbers because its employees normally will not all be using their telephones to make or receive calls to or from outside the business at the same time. Assuming

serve those same employees using the same telephone numbers, it would see its bill skyrocket by more than $950 each month in additional 911 charges. Accepting that interpretation of the 911 Act would cause it to be expressly preempted by § 615a-1(f)(1), because the "amount" of 911 charges applied to a VoIP subscriber would "exceed the amount . . . applicable to the same class of subscribers to [non-VoIP] telecommunications services." Accordingly, under South Carolina law, this Court should resolve any ambiguity in the 911 Act by holding that the 50-charge cap applies to both VoIP and non-VoIP services, as § 615a-1(f)(1) requires.[23]

*Second*, it is a "settled principle" of South Carolina law that, where "'a tax law is ambiguous,'" that ambiguity "must be resolved in favor of the taxpayer." *Alltel Commc'ns, Inc. v. S.C. Dep't of Revenue*, 731 S.E.2d 869, 872 (S.C. 2012) (quoting *Cooper River Bridge, Inc. v. S.C. Tax Comm'n*, 188 S.E. 508, 509-10 (S.C. 1936) ("[W]here the language relied upon to bring a particular person within a tax law is ambiguous or is reasonably susceptible of an interpretation that will exclude such person, then the person will be excluded, any substantial doubt being resolved in his favor.")); *see also S.C. Nat'l Bank v. S.C. Tax Comm'n*, 376 S.E.2d 512, 513 (S.C. 1989) ("In the enforcement of tax statutes, the taxpayer should receive the benefit in cases of doubt."). As demonstrated above, 911 charges are taxes. *See supra* p. 12.

---

the truth of Plaintiffs' allegation of the specific number of telephone numbers a PRI can support, a business could purchase 10 PRIs to support more than 1,000 working telephone numbers.

[23] On the other hand, if the Court concludes that the 911 Act unambiguously imposes a 50-charge cap only for non-VoIP services and no cap at all for VoIP services, the Court should find that the 911 Act is preempted to the extent it requires VoIP customers to pay more than 50 911 charges per month, per account. *See, e.g.*, *Priester v. Cromer*, 736 S.E.2d 249, 252 (S.C. 2012) (recognizing that "[t]he preemption doctrine is rooted in the Supremacy Clause of the United States Constitution and provides that any state law that conflicts with federal law is 'without effect'"). Either way, the Court must dismiss the Complaint insofar as it alleges that the 50-charge cap does not apply to VoIP services.

The Complaint's allegations about the meaning of the 911 Act's 50-charge cap would impose a massive tax increase on large business customers that purchase VoIP service. For this reason as well, if the Court concludes there is any ambiguity about whether the 911 Act's 50-charge cap applies to VoIP customers, "[i]t necessarily follows . . . that such ambiguity must be construed in the taxpayers' favor" by capping 911 charges to VoIP customers at 50 per account per month. *Alltel Commc'ns*, 731 S.E.2d at 873.

## CONCLUSION

For all of these reasons, this Court should strike the class allegations and dismiss each count of the Complaint insofar as it alleges that Defendants violated the 911 Act by (a) not billing 23 911 charges to any multiplex customer that was not purchasing "fractional PRI service not delivered by a broadband connection" service that is capable of simultaneously supporting 23 outward voice channels, and (b) not billing more than 50 911 charges to its VoIP customers.

Dated:  January 7, 2019     Respectfully submitted,

          /s/ Christy Ford Allen  
          John A. Massalon (#5227)
          Christy Ford Allen (#7549)
          WILLS MASSALON & ALLEN LLC
          Post Office Box 859
          Charleston, SC 29402
          (843) 727-1144
          jmassalon@wmalawfirm.net
          callen@wmalawfirm.net

          Scott H. Angstreich
           (admitted *pro hac vice*)
          David L. Schwarz
           (admitted *pro hac vice*)
          Lillian V. Smith
           (admitted *pro hac vice*)
          Kevin D. Horvitz
           (admitted *pro hac vice*)
          KELLOGG, HANSEN, TODD,
           FIGEL & FREDERICK, P.L.L.C.
          1615 M Street, N.W., Suite 400
          Washington, D.C. 20036
          (202) 326-7900
          (202) 326-7999 (fax)
          sangstreich@kellogghansen.com
          dschwarz@kellogghansen.com
          lsmith@kellogghansen.com
          khorvitz@kellogghansen.com

          *Counsel for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I, Christy Ford Allen, hereby certify that a true and correct copy of the foregoing

document filed through the ECF system was transmitted electronically to the registered

participants as identified on the Notice of Electronic Filing (NEF) and that paper copies have

been sent to those indicated as non-registered participants by United States first-class mail or

hand delivery on January 7, 2019.


/s/ Christy Ford Allen_____